**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | CIVIL ACTION NO. 3:04-CV-2427 |
| v. | (JUDGE CAPUTO) |
| REV. ALBERT M. LIBERATORE, JR., DIOCESE OF SCRANTON, SACRED HEART OF JESUS CHURCH, BISHOP JAMES C. TIMLIN, REV. JOSEPH R. KOPACZ and BROTHER ANTONIO F. ANTONUCCI, | |
| Defendants. | |

**<u>MEMORANDUM</u>**

Presently before the Court are Defendants Diocese of Scranton (the "Diocese"), Sacred Heart of Jesus Church ("Sacred Heart"), Bishop James C. Timlin ("Bishop Timlin"), Rev. Joseph R. Kopacz ("Father Kopacz") (collectively the "Diocesan Defendants") and Brother Antonio F. Antonucci's ("Brother Antonucci") (collectively "Defendants") motions for summary judgment (Docs. 75-1, 76) as to Counts I, III, IV, V, VI, VII and VIII of Plaintiff John Doe's Complaint (Doc. 1). The Diocesan Defendants also seek summary judgment as to Plaintiff's claim for punitive damages. For the reasons stated below, the Court will grant in part and deny in part Defendants' motions. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367(a).

**BACKGROUND**

I.   **Factual History**

   A.   **Defendant Rev. Albert M. Liberatore and Richard Roe**

   Defendant Rev. Albert M. Liberatore ("Liberatore") was ordained as a priest in the Diocese by Bishop Timlin on August 26, 1989. (Curriculum Vitae of Rev. Albert M. Liberatore, Doc. 88-2 p. 5, "Liberatore CV".)  Following several years of study at the Catholic University of Louvain, in Leuven, Belgium, towards obtaining a Ph.D. in Theology, Liberatore returned to Scranton and, in June of 1995, was assigned by Bishop Timlin to serve as Vocations Director of the Diocese. (Bishop James C. Timlin Dep. 168:2-5, Sept. 22, 2006, Docs. 88-5, 88-6; Liberatore CV at 2.)  Liberatore took up residence at St. Pius X Seminary (the "Seminary") in Dalton, Pennsylvania. (Liberatore CV at 2.)  Liberatore also taught classes at the University of Scranton as a non-resident faculty member. (Liberatore CV at 2; Richard Roe Dep. 11:18-19, Sept. 5, 2006, Doc. 88-4.)

   In the fall of 1995, Liberatore befriended Richard Roe ("Roe"), a twenty-one (21) year old male student in the Sacramental Theology class which he taught at the University of Scranton.[1] (Roe Dep. 11:17-14:18.)  Later that semester, Liberatore wrote Roe a letter inquiring as to whether Roe was interested in discerning whether he had a calling for the priesthood. (Roe Dep. 12:1-22.)  Roe, in fact, was interested, and, thereafter, he and Liberatore began spending a great deal of time together. (Roe Dep.

---

[1] Although they were adults, the Court chooses to refer to Roe and others with whom Liberatore engaged in inappropriate conduct by fictitious names because of the delicate nature of the facts in this case.

15:2-18:22.)  Liberatore took Roe out to dinner, purchased gifts for him, and took him to New York City on multiple occasions. (*Id.*)

In the spring of 1996, Liberatore encouraged Roe, then a college senior and near graduation, to pursue a full-time position as the Director of Youth and Young Adult Retreats for the Diocese. (Roe Dep. 20:9-11.)  This position would require Roe to have an office at the Seminary, where Liberatore resided. (Roe Dep. 21:10-12.)  Roe was hired for the position, thanks in part to Liberatore's recommendation. (Roe Dep. 21:14-18.)

After Roe graduated from the University of Scranton, Liberatore took him to Los Angeles, California, as a graduation gift. (Roe Dep. 23:1-15.)  The night before Liberatore and Roe were to fly to Los Angeles they went out to several bars to drink. (Roe Dep. 24:1-6.)  On the way home, Liberatore and Roe sat in the back seat of a car driven by one of Liberatore's friends. (Roe Dep. 24:8-17.)  During the drive, Liberatore "leaned on [Roe] and put his hand on [Roe's] thigh." (Roe Dep. 24:20-22.)  Roe construed this as a sexual overture. (Roe Dep. 27:17.)

Despite the sexual overture on the part of Liberatore, for much of the summer of 1996, Roe stayed in Liberatore's bedroom at the Seminary while he looked for an apartment. (Roe Dep. 29:1-6; 33:1.)  After Roe had found an apartment, he oftentimes stayed overnight in Liberatore's bedroom at the Seminary. (Roe Dep. 32:16-33:1.)  This state of affairs was not kept secret from the other seminarians. (Roe Dep. 33:5-8.)  Liberatore would also oftentimes fail to return to the Seminary and instead stay overnight at Roe's apartment. (Roe Dep. 46:1-4.)  Near the end of the summer of 1996, Liberatore began having discussions with Roe about sexuality, particularly in regard to what had transpired in the car on the way home from the night of drinking. (Roe Dep. 19:14-22;

3

27:2-18.)

During the fall of 1996, Liberatore took Roe and another seminarian, Michael Moe ("Moe"), who was then nineteen (19) years of age, to New York City for dinner and drinks. (Roe Dep. 29:19-31:7; Decl. of Michael Moe ¶ 15, Sept. 14, 2006, Doc. 88-8.)  The three of them then stayed the night in a hotel suite. (Roe Dep. 30:18-31:1.)  While Moe slept on the couch, Liberatore and Roe slept in the lone bed. (Roe Dep. 31:14-16.)

This incident was called to the attention of Bishop Timlin by Father Bambera, who, in November of 1996, wrote a memo to Bishop Timlin expressing "serious concerns . . . regarding questionable behavior of Father Al Liberatore." (Memo from Father Bambera to Bishop Timlin, dated November 27, 1996, Doc. 80-7, "Bambera Memo".)  Father Bambera described this incident as one of "grave concern." (*Id.*)  Father Bambera also informed Bishop Timlin of the "evolution of [the] relationship" between Liberatore and Roe, which he stated had "become very obvious to the seminarians as well." (*Id.*)  While Father Bambera opined that he did not feel there was anything improper about the relationship, he related to Bishop Timlin that Liberatore and Roe spent "an inordinate amount of time" together, that Roe was "often in [Liberatore's] rooms until late at night, and that Roe "often becomes the focus of [Liberatore's] attention at seminary gatherings." (*Id.*)  Father Bambera also noted that he had informed others in the Diocese, namely Monsignor David Bohr, Bishop Dougherty, Monsignor John Esseff and Monsignor Dale Rupert, of the relationship between Liberatore and Roe. (*Id.*)

On an evening in the fall of 1996, Liberatore and Roe were watching a movie in Liberatore's room at the Seminary. (Roe Dep. 39:1-22.)  Roe was lying on the couch while Liberatore was lying on the floor near the couch. (*Id.*)  After the movie, Liberatore

4

tried to touch Roe in a sexually explicit manner. (Roe Dep. 46:12-18.)  Liberatore then began to discuss sexuality – homosexuality in particular – with Roe. (Roe Dep. 43:8-12.) During this conversation, Liberatore encouraged Roe to engage in homosexual relations with him. (Roe Dep. 43:11-44:10.)  Liberatore also discussed with Roe the homosexual activity that Liberatore had engaged in with others, including describing in detail what homosexual acts he had performed. (Roe Dep. 44:17-22.)  In fact, Liberatore described homosexual acts in which he had engaged while living in the Seminary. (Roe Dep. 44:20-22.)

In the early part of 1997, Liberatore and Roe took a trip to Philadelphia. (Roe Dep. 50:10-13.)  After spending the evening at Dave & Buster's, a bar and arcade, Liberatore and Roe stayed the night in a hotel room. (Roe Dep. 53:16-22.)  During the night, Liberatore "got out of his bed and got into [Roe's] bed and laid down next to [Roe] and put his arm around [Roe], and at some point during the night [Liberatore] put his hand down [Roe's] pants." (*Id.*)

Roe related other incidents in which Liberatore made unwanted sexual contact with him, including one instance when Roe awakened to find Liberatore's penis in his hand. (Roe Dep. 69:6-7.)

Another incident, occurring during the spring of 1997, began at dinner when Liberatore maneuvered his foot into Roe's crotch while they were at a restaurant. (Roe Dep. 56:20-57:2.)  After dinner, Liberatore invited Roe back to spend the night in his bedroom at the Seminary. (Roe Dep. 57:16-18.)  While speaking in the sitting room before heading to bed, Liberatore expressed his displeasure in Roe's attraction to a young woman whom he knew. (Roe Dep 47:14-48:15; 58:2-7.)  Roe then "got pretty

emotional" and started to cry. (Roe Dep. 58:7-9.)  Roe then tried to leave Liberatore's room, but Liberatore physically blocked his attempt. (Roe Dep. 59:2-4.)  Roe then tried to throw Liberatore out of the way. (Roe Dep. 59:9.)  Pushing and shoving ensued, and Liberatore ended up falling on the ground. (Roe Dep. 59:10-11.)  This altercation awakened many, if not all, of the seminarians and faculty.  (Letter from Roe to The Seminarians of St. Pius X Seminary, dated April 5, 1997, Doc. 80-8, "Roe Letter".)  One seminarian, Reverend Thomas Muldowney ("Father Muldowney"), even came to Liberatore's room to help calm Roe down. (Roe Dep. 59:12-13.)  Father Muldowney stated in his deposition that Roe, appearing very upset, yelled, "I'm a twenty-two (22) year old fucking homosexual." (Reverend Thomas Muldowney Dep. 46:1-4, Dec. 8, 2005, Doc. 88-8 p.16 of 26.)  Father Muldowney stated that several other seminarians heard the commotion and came to the room. (Muldowney Dep. 46:5-11.)  Father Muldowney reported the incident to Monsignor Bohr, the Rector at the Seminary, who, in turn, contacted Bishop Timlin to inform him of it. (Monsignor David Bohr Dep. 42:8-43:11, Jan. 3, 2006, Doc. 82-2.)  Eventually, Roe was calmed down and then fell asleep in Liberatore's room. (Roe Dep. 60:1-3.)  When Roe woke up the next morning, he found that he was in Liberatore's bed with Liberatore in bed next to him. (Roe Dep. 60:4-6.)  Liberatore's hand was down Roe's pants and was touching Roe's penis. (Roe Dep. 60:7.)  Liberatore then attempted to perform oral sex on Roe. (Roe Dep. 61:2-3.)  At that point, the bell for morning prayer rang, and Roe was able to extricate himself from the situation. (Roe Dep. 60:12-18.)

A few days later, Roe told Monsignor Rupert that he had been sleeping in Liberatore's bedroom, in Liberatore's bed. (Roe Dep. 62:20-63:3.)  Roe also informed Monsignor Rupert that Liberatore had made several attempts to have homosexual contact with Roe. (Roe Dep. 63:12-15.)  Roe had many conversations with Monsignor

Rupert regarding his relationship with Liberatore. (Roe Dep. 63:9-10.)

In March of 1997, Bishop Timlin was informed of an incident involving Liberatore and one of the male seminarians. (Summary of Concerns Regarding Fr. Liberatore, dated March 1997, Doc. 88-8, "Summary".)  During a tour of the Seminary, on February 24, 1997, twenty (20) boys from Bishop Hoban High School "passed by the open door to Peter Poe's room in which Fr. Al [Liberatore] was seen lying on Peter's bed and being given a back massage by Peter." (Summary at 2.)  Bishop Timlin was also informed of Liberatore's "close relationships" with several of the seminarians, including Michael Moe. (Summary at 1.)

After the altercation between Liberatore and Roe and the back massage with Poe, Bishop Timlin removed Liberatore from the Seminary and reassigned him to St. Clare's Parish in Dunmore, Pennsylvania. (Bohr Dep. 44:8-9; 68:21-69:4; *See* Roe Letter at 3.) In July of 1997, Liberatore was reassigned again, this time to Sacred Heart, located in Duryea, Pennsylvania.  (*See* Doc. 1-1 ¶ 11.)  Shortly thereafter, Liberatore was named the Pastor of Sacred Heart. (*See id.*)

### B.      Liberatore and Plaintiff

Plaintiff was a parishioner and alter server of Sacred Heart. (Moe Decl. ¶ 20.)  In 1999, Liberatore, as Pastor of Sacred Heart, hired Plaintiff, who was then fourteen (14) years of age, to work at Sacred Heart as a sacristan. (*See* Doc. 1-1 ¶ 14; Patricia Minora Dep. 13:1-6, Jan. 26, 2006, Doc. 89-2.)  Over the course of the next year, Liberatore "groomed" Plaintiff (Pl.'s Dep. 166:4-7, Oct. 17, 2006, Doc. 89-3 p.13) – that is, Liberatore undertook to establish an intimate friendship with Plaintiff in preparation to the eventual introduction of sexual activity. Wikipedia, The Free Encyclopedia, "Child Grooming", http://en.wikipedia.org/wiki/Child_grooming (last visited March 15, 2007).

During this time, Liberatore took Plaintiff to movies and restaurants (Pl.'s Dep. 153:3-5), and gave him expensive gifts, such as a Movado watch, a cellular phone and fencing equipment. (Minora Dep. 15:4-10; 17:14-16.)  The Diocesan Defendants agree that Liberatore's actions with regard to Plaintiff would be characterized as grooming behavior. (Timlin Dep. 36:8-37:9.)  Liberatore also provided counseling to Plaintiff and Plaintiff's mother after Plaintiff's father had taken ill and, then, passed away. (Moe Decl. ¶¶ 22-25.) Liberatore became a father figure to Plaintiff. (*Id.*; Pl.'s Dep. 189:20-190:1.)

Eventually, Liberatore began to make sexual overtures toward Plaintiff. (Pl.'s Dep. 166:7-10.)  More than two years of sexual abuse ensued, ultimately ending in May of 2002. (*See* Doc. 1-1 ¶ 37.)  During this period of time, Plaintiff would routinely sleep in Liberatore's bed in the Rectory at Sacred Heart. (Pl.'s Dep. 169:24-25.)  On nights Plaintiff would sleep over, Liberatore would oftentimes "spoon" Plaintiff (Pl.'s Dep. 173:5-10) – that is, Liberatore and Plaintiff would lie in bed on their sides with Liberatore's front to Plaintiff's back, such that they fit together in a manner similar to spoons. Wikipedia, *supra*, "Spooning", http://en.wikipedia.org/wiki/Spooning.  On many nights, Liberatore would masturbate while Plaintiff was lying with him in bed. (Pl.'s Dep. 173:10-14.)

Plaintiff also related incidents in which Liberatore would grope Plaintiff's genitals (Pl.'s Dep. 173:21-25), wear Plaintiff's clothes (Pl.'s Dep. 173:21-22), and describe sexual techniques and other graphic sexual behavior (Pl.'s Dep. 179:1-5).  Liberatore would also wrestle with Plaintiff, oftentimes groping him in a sexual manner rather than attempt a wrestling maneuver. (Pl.'s Dep. 65:18-66:2.)  Liberatore also admitted to Plaintiff that he was a homosexual, and described to Plaintiff sexually explicit acts which he and his homosexual friends would perform. (Pl.'s Dep.179:12-16.)  Liberatore also took Plaintiff on trips to New York, staying overnight in a single hotel room with only one

bed. (Pl.'s Dep. 189:5-14.)  In addition, Liberatore took Plaintiff to Belgium while he was

completing his dissertation. (Pl.'s Dep. 152:12; Minora Dep. 15:6.)  While in Belgium,

Plaintiff slept in the same bed with Liberatore, who would masturbate in the bed and

grope Plaintiff while he tried to sleep. (Pl.'s Dep. 245:7-13.)

### C.    The Diocesan Defendants

On several occasions the Diocesan Defendants were informed of some of the

behavior involving Liberatore and Plaintiff.  In January of 2001, Patricia Minora ("Minora"),

a friend of Plaintiff's mother, spoke to two priests with whom she had been long-time

friends, Monsignors Kevin O'Neill and Joseph Kelly, about her suspicions concerning the

relationship between Liberatore and Plaintiff. (Minora Dep. 21:14-31:8.)  Minora told them

that Plaintiff slept overnight in the Rectory with Liberatore, and that Liberatore had given

Plaintiff extravagant gifts and even taken Plaintiff on overnight trips. (*Id.*)  These priests

advised Minora to contact Father Kopacz and inform him of her suspicions. (*Id.*)  Minora

then called Father Kopacz and told him of the relationship between Liberatore and

Plaintiff. (*Id.*)

After receiving a phone call from Minora concerning the relationship between

Liberatore and Plaintiff, Monsignor Kevin O'Neill wrote a letter to Bishop Timlin informing

him as to what Minora had told him – i.e., that Plaintiff had been sleeping overnight in

Liberatore's bedroom at the Rectory and that Liberatore had taken Plaintiff on several

overnight trips.  (Letter from Monsignor Kevin O'Neill to Bishop Timlin, dated January 29,

2001, Doc. 89-4 p. 34 of 42, "O'Neill Letter".)

Additionally, in late 2000 and early 2001, Ann Marie Zongilla ("Zongilla"), a cook

and housekeeper at Sacred Heart (Ann Marie Zongilla Dep. 6:24-25, Jan. 30, 2006, Doc.

89-4), voiced her suspicion that Liberatore was sexually abusing Plaintiff to Susan

Doxbeck, the Pastoral Assistant at Sacred Heart, Father Emmanuel, a priest at Sacred Heart, Reverend Edward Williams ("Father Williams"), also a priest at Sacred Heart, and Monsignor John Bendik. (Zongilla Dep. 28:18-21; 36:21-24; 37:6-8; 44:2-9; 60:13-15; Reverend Edward Williams Dep. 35:19-23, Jan. 26, 2006, Doc. 80-2.)

In the fall of 2001 (*see* Williams Dep. 35:19-23), Helen Negvesky ("Negvesky"), an employee for the Diocese, informed Monsignor Bendik of her concerns about the relationship between Liberatore and Plaintiff. (Helen Negvesky Dep. 40:5-21, Nov. 17, 2005, Doc. 80-4.) Negvesky testified that she told Monsignor Bendik that Plaintiff was "around the Rectory more than [she] thought he should be, and the way Father [Liberatore] looked at him, that they went places together, and just that it didn't seem right, . . . [and] it didn't look good." (Negvesky Dep. 41:22-42:3.) Negvesky also told Monsignor Bendik of an incident in which Plaintiff "put his hand down Liberatore's pants." (Negvesky Dep. 42:14-17.) Negvesky also stated that there were empty bottles of alcohol littered around Liberatore's room in the Rectory, and, consequently, she suspected that Liberatore was plying Plaintiff with alcohol. (Negvesky Dep. 43:14-22.)

Also in the fall of 2001, after receiving reports from Negvesky and Zongilla concerning suspicious behavior engaged in by Liberatore and Plaintiff, Father Williams spoke with Monsignor Bendik about the relationship between Liberatore and Plaintiff. (Williams Dep. 35:19-36:25.) Father Williams informed Monsignor Bendik that he thought Liberatore was obsessed with Plaintiff and that Liberatore spent an inordinate amount of time with Plaintiff, including wrestling with Plaintiff and taking Plaintiff on overnight trips. (Williams Dep. 35:19-36:25.) Father Williams also told Monsignor Bendik that the Sacred Heart staff suspected that Liberatore was sexually abusing Plaintiff.

10

(Williams Dep. 37:7-9.)

Monsignor John Bendik acknowledged that he had received calls from Negvesky and Zongilla, each of whom voiced a suspicion that Liberatore was sexually abusing Plaintiff. (Monsignor John Bendik Dep. 38:18-19; 41:1; 41:20; 47:1-2, Doc. 89-1.) Monsignor Bendik also stated that he had spoken with Father Williams, who expressed his own concerns regarding the impropriety of the relationship between Liberatore and Plaintiff. (Bendik Dep. 52:15-17.)  After his conversation with Father Williams, Monsignor Bendik contacted Father Kopacz and "told him there was a concern expressed to me from the Parish of Sacred Heart about [the] relationship [between Liberatore and Plaintiff]." (Bendik Dep. 38:18-22.)  Specifically, Monsignor Bendik told Father Kopacz that Liberatore had "a relationship with a young man [at Sacred Heart] parish that could be going beyond the barriers, beyond the parameters, and he better check it out." (Bendik Dep. 65:18-20.)  Monsignor Bendik also told Father Kopacz that "something had better be done for the sake of [Plaintiff]." (Bendik Dep. 61:11-12.)

As noted above, Bishop Timlin was informed of Liberatore's behavior, with regard to both Roe and Plaintiff, and the suspicions raised by it.  With regard to Roe, Bishop Timlin received the Bambera Memo informing him of Father Bambera's "grave concern[s]" regarding the relationship between Liberatore and Roe, including the fact that Roe was often in Liberatore's room until late at night. (Bambera Memo.)  Bishop Timlin was also notified of the incident that occurred late at night at the Seminary involving Liberatore and Roe. (Bohr Dep. 42:8-43:11.)  In addition, Bishop Timlin was informed of Poe giving Liberatore a back massage while Liberatore lay on Poe's bed. (Summary at 2.)

11

With regard to Plaintiff, in January of 2001, Bishop Timlin received the O'Neill Letter informing him that Plaintiff oftentimes slept overnight in Liberatore's bedroom at the Rectory and that Liberatore had taken Plaintiff on several overnight trips. (O'Neill Letter.)

### D.    Brother Antonio F. Antonucci

Brother Antonio Antonucci, a Benedictine monk who moved to Scranton in the Fall of 2000 to attend the University of Scranton (Brother Antonio Antonucci Dep. 12:7-13:14-15; 14:12-13, Sept. 18, 2006, Doc. 90-2), was also informed of Liberatore's sexual abuse of Plaintiff. (Pl.'s Dep. 65:1-66:19).  Specifically, Plaintiff told Brother Antonucci, who worked as a cantor, custodian and cook at Sacred Heart (Doc. 76 ¶ 5), that he slept in Liberatore's bed in the Rectory (Pl.'s Dep. 64:8-11), and that Liberatore would grope Plaintiff in a sexual manner while they wrestled. (Pl.'s Dep. 65:14-66:5.)  Rather than encourage Plaintiff to contact the police, or, at the least, tell his mother, Brother Antonucci instructed Plaintiff "to forgive [Liberatore], to keep the issue private, and to not let other people know because it would ruin [Plaintiff's] life and [the lives of] others." (Pl.'s Dep. 66:12-15.)

### E.    Plaintiff's Relationship with Liberatore Ends

In May of 2002, when Plaintiff was seventeen (17) years old, Liberatore touched Plaintiff's genitals while they were in Liberatore's office at the University of Scranton. (Votum of Bishop Joseph Martino, dated July 23, 2004, Doc. 88-2 pp. 2-3, "Votum".)  Later that month, Liberatore took Plaintiff on a trip to New York, staying overnight in the same bed at a hotel. (*See* Pl.'s Dep. 197:23-25; 199:19-23; Doc. 1-1 ¶ 37.)  During the

night, Liberatore tried to give Plaintiff oral sex, placing his mouth around Plaintiff's penis. (Pl.'s Dep. 199:19-23.)  At this point, it became obvious to Plaintiff that Liberatore had homosexual intentions regarding him. (*Id.*)  These were the last incidents of sexual abuse perpetrated by Liberatore upon Plaintiff.

### F.      Liberatore's Dismissal from the Clergy and his Criminal Convictions

In July of 2003, Joseph Martino was named Bishop of Scranton, replacing Bishop Timlin. (Bishop Joseph Martino Dep. 10:5, July 13, 2006, Doc. 88-3.)  Martino officially became Bishop on October 1, 2003. (Bishop Martino Dep. 11:9.)  At some point early in his tenure, Bishop Martino became aware of the rumors and incidents involving Liberatore. (Bishop Martino Dep. 14:5-8.)  Upon review of Liberatore's personnel file, Bishop Martino became "alarmed" at the history of inappropriate behavior. (Bishop Martino Dep. 21:12-25.)  Bishop Martino was troubled by the incident at the Seminary involving Roe, the back massage involving Peter Poe, and another incident which occurred in December of 2002 while Liberatore was visiting the Catholic University of Louvain in Belgium. (*See* Bishop Martino Dep. 32:12-33:25.)  Bishop Martino discovered that, sometime during Liberatore's tenure as a priest in the Diocese, he had been sent to Southdown Institute, a non-profit clinic and psychological treatment facility for clergy located in Ontario, Canada, http://www.southdown.on.ca/#. (*See* Bishop Martino Dep. 39:23-40:2.)  Bishop Martino spoke with Liberatore in late November of 2003 about the concerns raised by Liberatore's file. (Bishop Martino Dep. 41:5-20.)

In January of 2004, Plaintiff and another young man came forward and alleged that Liberatore had sexually abused them. (*See* Bishop Martino Dep. 108:16-18.)  Later

that month, Bishop Martino hired an investigator, James Seidel ("Seidel"), to investigate these allegations. (Bishop Martino Dep. 108:8-11; *see* James Seidel Investigative Insert, Doc. 89-5 pp.16-17.)

In May of 2004, Liberatore was arrested and charged with sexual abuse in the State of New York, as well as multiple counts of indecent assault and corruption of minors in the Commonwealth of Pennsylvania. (Doc. 89-3 pp. 34-44; Doc. 41-2 p. 24.) Liberatore pleaded guilty to those offenses. (*Id.*)  On July 23, 2004, Bishop Martino dismissed Liberatore from the clerical state, having concluded that "the delict of sexual abuse of a minor was committed by the Reverend Albert M. Liberatore." (Votum at 1.)

## II.     Procedural History

On November 5, 2004, Plaintiff filed a Complaint in this Court. (Doc. 1-1.)  Therein, Plaintiff asserted a claim pursuant to 18 U.S.C. § 2255, a section of The Child Abuse Victims' Rights Act of 1986. (Doc. 1-1 ¶¶ 48-51.)  Plaintiff also raised state law claims of assault and battery (Doc. 1-1 ¶¶ 52-55), vicarious liability (Doc. 1-1 ¶¶ 56-62), aiding and abetting (Doc. 1-1 ¶¶ 63-68), negligent hiring, supervision and retention (Doc. 1-1 ¶¶ 69-75), negligence per se (Doc. 1-1 ¶¶ 76-81), intentional infliction of emotional distress (Doc. 1-1 ¶¶ 82-88), and breach of fiduciary duty (Doc. 1-1 ¶¶ 89-95).  On November 3, 2006, both the Diocesan Defendants and Brother Antonucci filed motions for summary judgment. (Docs. 75, 76.)  These motions are fully briefed and ripe for disposition.

**LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

14

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the

15

material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.  *See Anderson*, 477 U.S. at 256-257.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## DISCUSSION

The Diocesan Defendants now move the Court to grant summary judgment in their favor as to Counts I, III, V, VI, VII and VIII of Plaintiff's Complaint.  Also, Brother Antonucci moves the Court to grant summary judgment in his favor as to Counts IV, VI, VII and VIII of Plaintiff's Complaint.  The Diocesan Defendants also seek summary judgment as to Plaintiff's claim for punitive damages.

**I.      Plaintiff's Federal Law Claim (Count I)**

Under 18 U.S.C. § 2255, "[a]ny person who, while a minor, was a victim of a violation of section 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422 or 2423 of this title[, sections which prohibit, inter alia, child molestation, exploitation and pornography,] and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such a person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains and the costs of the suit, including a reasonable attorney's fee."  Section 2255 thus provides child victims of sexual abuse, molestation and exploitation with a federal cause

of action for money damages.  The issue here is against whom may that federal cause of action be brought.  The Diocesan Defendants argue that section 2255 only subjects Liberatore, the one who has violated statutes listed in section 2255, to civil liability. Conversely, Plaintiff argues that the Diocesan Defendants can be held liable for the offenses committed by Liberatore under the doctrine of agency.

Neither the United States Supreme Court nor the United States Court of Appeals for the Third Circuit has had any cases concerning section 2255.  Indeed, there is only a single reported case involving section 2255.

In *Smith v. Husband*, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005), the United States District Court for the Eastern District of Virginia, held, after analyzing the legislative history of section 2255 to determine Congress' intent, that a criminal conviction under one of the listed statutes was not a prerequisite to the institution of a civil action under section 2255.  The court first noted that section 2255 was enacted as part of The Child Abuse Victims' Rights Act of 1986 on October 18, 1986. *Id.* at 611; *see* Pub. L. No. 99-500, 100 Stat. 1783-39 (1986).  This enactment expanded the scope of the Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. 95-225, 92 Stat. 7 (1978), "to provide a civil remedy for personal injuries suffered by victims of child sexual exploitation." *Id.*  Initially, this civil remedy was to be included in the civil Racketeer Influenced and Corrupt Organizations ("RICO") statutes, which already provided remedies for victims of crime. *Id.* (citing 132 Cong. Rec. H3362-02 (daily ed. June 5, 1986) (statement of Rep. Young) ("The Child Abuse Victims['] Rights Act of 1986 is a crucial piece of legislation.  This bill would at last add the sexual exploitation of children part to the Racketeer[ ] Influence[d] and Corrupt Organizations statute[ ]")).  Later drafts

17

of the bill were also proposed to be contained within the RICO statutes. *Id.* (citing 132 Cong. Rec. E1983-01 (daily ed. June 5, 1986) (statement of Rep. Siljander during extension of remarks)).  "The intent in proposing to include the statute within RICO was to allow for increased criminal penalties as well as expanded investigatory powers to arrest perpetrators of the offenses." *Id.* (citing 132 Cong. Rec. H3362-02 (daily ed. June 5, 1986) (statement of Rep. Young)).  Child pornography, transportation of minors for illegal sexual activity and related offenses, sections 2251, 2251A, 2252, 2260, 2421, 2422 and 2423, were, in fact, added to the definition of racketeering activities under the RICO statutes.  *Id.*; *see* 18 U.S.C. § 1961(1)(B) (including within the definition of "racketeering activity" any act which is indictable under sections 2251, 2251A, 2252, 2260, 2421, 2422 and 2423).

At first, the proposed civil remedy would have given the Government or the victim the right to sue the offender in order to receive treble damages and attorney fees, but not until after the "offender [was] convicted under Civil RICO." 132 Cong. Rec. E290-02 (Feb. 5, 1986) (statement of Rep. Siljander) ("If an offender is convicted under Civil RICO, the Government or the victim is given the right to sue the offender in order to receive treble damages and attorney fees").  In later debates, a bill was proposed that provided a cause of action to any person injured personally *from an act indictable* under certain child sexual exploitation statutes. *Smith*, 376 F. Supp. 2d at 611 (citing 132 Cong. Rec. E1983-01 (daily ed. June 5, 1986) (statement of Rep. Siljander during extension of remarks)).  During later congressional proceedings, one of the congressional representatives who introduced the bill stated "[f]or purposes of [section 2255], violations are to be determined by a preponderance of the evidence.  Successful plaintiffs are entitled to recover the cost

of the suit, including a reasonable attorney's fee, *from those found guilty of a violation*."

132 Cong. Rec. E3242-02 (daily ed. September 23, 1986) (statement of Rep. Green

during extension of remarks) (emphasis added); *see id.*

Based on this legislative history, the *Smith* court concluded that Congress' intent

was "to make the civil remedies provision available to any victim able to show by a

preponderance of the evidence that *the defendant committed the acts described in any of

the listed offenses.*" *Id.* at 613 (emphasis added).

This Court concludes that, based upon *Smith* and the legislative history of section

2255, in order to be subject to liability under section 2255, a defendant must be proven to

have violated at least one of the criminal statutes listed in section 2255 by a

preponderance of the evidence.

Here, there is sufficient evidence that would allow a reasonable jury to conclude

that such violations occurred, as Plaintiff has offered evidence that Liberatore knowingly

transported Plaintiff, while a minor, to New York and Europe, in interstate and foreign

commerce, with the intent of engaging in illegal sexual activity with Plaintiff, in violation of

18 U.S.C. §§ 2421, 2422 and 2423.  However, the Diocesan Defendants argue that they

did not take part in Liberatore's criminal activities.  As such, they contend they cannot be

liable under section 2255.

Under 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States

or aids, abets, counsels, commands, induces or procures its commission is punishable *as

a principal*" (emphasis added).  As such, one who criminally aids or abets a listed offense

is punishable as though he himself committed the offense. *United States v. Private*

*Sanitation Industry Association of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1134 (E.D.N.Y. 1992).   Consequently, if one has aided or abetted another in violating one of the statutes listed in section 2255, then he himself has committed an act indictable under that listed statute.   As the aider or abettor has himself committed an indictable act, he is liable to the plaintiff under section 2255. *See* 132 Cong. Rec. E1983-01 (daily ed. June 5, 1986) (statement of Rep. Siljander during extension of remarks).   Accordingly, if the Diocesan Defendants criminally aided or abetted Liberatore in the commission of his sexual offenses, they may be held liable under section 2255.

In order to establish the offense of criminal aiding and abetting, it must be shown that: (1) the substantive offense has been committed; (2) the defendant knew the offense was being committed; and (3) the defendant acted with the intent to facilitate it. *United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir. 2004) (citations omitted); *see also United States v. Newman*, 490 F.2d 139, 143 (3d Cir. 1974) (in order to be liable as an aider or abettor, the defendant must have participated in the substantive crime with the desire that the crime be accomplished; unknowing participation is not sufficient to constitute an offense under the aiding and abetting statute).   "[A]cting with intent to facilitate the substantive offense requires that one acted with the 'intent to help those involved with a *certain* crime.'" *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991) (quoting *United States v. Wexler*, 838 F.2d 88, 92 (3d Cir. 1988)).   Indeed, "[t]he state of mind required for conviction as an aider and abettor is the same state of mind as required for the principal offense." *United States v. Centner*, 116 F.3d 473 (Table), 1997 WL 328766, at *2 (4th Cir. 1997); *United States v. Loder*, 23 F.3d 586, 591 (1st Cir. 1994); *United*

*States v. Valencia*, 907 F.2d 671, 680 (7th Cir. 1990); *United States v. Gallishaw*, 428 F.2d 760 (2d Cir. 1970).

As noted, there is sufficient evidence to allow a reasonable jury to conclude that multiple listed offenses were committed by Liberatore.  As such, the first element of criminal aiding and abetting is satisfied.  However, even viewing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that the second and third elements of the aiding and abetting offense are satisfied.  While Plaintiff's evidence demonstrates that the Diocesan Defendants had reason to suspect that Liberatore was sexually abusing Plaintiff, there is nothing in the record demonstrating that the Diocesan Defendants consciously shared Liberatore's knowledge of the underlying substantive offenses, as well as the specific criminal intent to commit them.  *See Loder*, 23 F.3d at 591.  Indeed, "[a] general suspicion that an unlawful act may occur is not enough." *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990).  While it is possible to infer knowledge from a combination of suspicion and indifference to the truth, *see United States v. Talkington*, 875 F.2d 591, 595 (7th Cir. 1989) (upholding district court's use of the so-called "ostrich instruction," which allows the inference of knowledge if it is found that the putative aider or abettor had a strong suspicion yet shut his eyes for fear of what he would learn), there still remains no evidence even remotely suggesting that the Diocesan Defendants shared Liberatore's specific intent to commit the sexual offenses.  While the Diocesan Defendants may have avoided learning of Liberatore's offenses, there is no evidence that the Diocesan Defendants desired that his crimes be accomplished.  Also absent from the record is any evidence showing that the Diocesan Defendants actively participated in some manner to assist Liberatore in the commission

21

of his offenses.  As such, the Diocesan Defendants' motion for summary judgement will be granted as to Count I of Plaintiff's Complaint.

## II.      Subject Matter Jurisdiction

Under 28 U.S.C. § 1367(a), "the district court shall have supplemental jurisdiction over all of the claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that include joinder or intervention of additional parties."  Thus, section 1367(a) provides for pendent-party jurisdiction in federal question cases. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 558 (2005) ("[t]he last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties").  Consequently, this Court may exercise supplemental jurisdiction over Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci so long as these claims share a common nucleus of operative fact with Plaintiff's federal law claim against Liberatore such that Plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

Under Third Circuit jurisprudence, "mere tangential overlap of facts is insufficient [to constitute a common nucleus of operative fact], but total congruity between the operative facts . . . is unnecessary." *Nanavati v. Burdette Tomlin Memorial Hospital*, 857 F.2d 96, 105 (3d Cir. 1988).  Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci satisfy this standard.

Plaintiff's federal claim against Liberatore arose from sexual abuse that was perpetrated by Liberatore while he was a priest within the Diocese.  Plaintiff's state claims against the Diocesan Defendants and Brother Antonucci are based on these same facts, with the caveat that Plaintiff's state claims require proof of additional facts beyond merely Liberatore's acts of abuse.  Thus, while not totally congruous, Plaintiff's federal and state claims share more than a mere tangential overlap.  As such, Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci share a common nucleus of operative fact with his federal law claims against Liberatore.  Therefore, the Court has jurisdiction over all of Plaintiff's federal and state claims.

The Court will now address Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci.

III.    **Plaintiff's State Law Claims against the Diocesan Defendants and Brother Antonucci (Counts III, IV, V, VI, VII and VIII)**

A.    **Vicarious Liability (Count III)**

In Count III, Plaintiff alleges that the Diocese, Sacred Heart and Bishop Timlin are vicariously liable for Liberatore's sexual molestation of Plaintiff, and that these acts were performed during the course of and within the scope of Liberatore's employment as a priest.  The Diocese, Sacred Heart and Bishop Timlin now move for summary judgment as to this count, arguing that Liberatore's acts were committed outside the scope of his employment.

Under Pennsylvania law, "an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were

23

committed during the course of and within the scope of the employment." *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979). "In certain circumstances, liability of the employer may also extend to intentional or criminal acts committed by the employee." *Id.* "The conduct of an employee is considered 'within the scope of employment' for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer." *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 699 (Pa. Super. Ct. 2000). "Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Fitzgerald*, 410 A.2d at 1272. Indeed, "a master is not liable for the willful misconduct of his servant, and that such willful misconduct, while it may be within the course of the employment, is not within the scope thereof." *McMaster v. Reale*, 110 A.2d 831, 832 (Pa. Super. Ct. 1955).

In addition, Pennsylvania courts have held that "an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment." *Fitzgerald*, 410 A.2d at 1272. For example, in *Sanchez by Rivera v. Montanez*, 645 A.2d 383 (Pa. Commw. Ct. 1994), a child and his parents sued a community action agency, alleging that the agency was vicariously liable for an

24

employee's sexual molestation of the plaintiff child.  The Commonwealth Court of Pennsylvania affirmed the trial court's entry of summary judgment in the defendant agency's favor, holding that the employee's actions were clearly outrageous and motivated purely by personal reasons. *Id.* at 391.

Here, it is clear that Liberatore's sexual molestation of Plaintiff was not within the scope or nature of his employment as a priest.  Indeed, "[t]he activity of which [Plaintiff] now complains is wholly inconsistent with the role of one who is received into the Holy Orders as an ordained priest of the Roman Catholic Church." *Hutchison by Hutchison v. Luddy*, 683 A.2d 1254, 1256 (Pa. Super. Ct. 1996).  Moreover, the acts of sexual abuse perpetrated by Liberatore were both outrageous and certainly not actuated by any purpose of serving the Diocese, Sacred Heart or Bishop Timlin.  As such, no reasonable jury could find in favor of Plaintiff on his vicarious liability claim.  Therefore, the Court will grant summary judgment in favor of the Diocese, Sacred Heart and Bishop Timlin as to Count III of Plaintiff's Complaint.

### B.   Aiding and Abetting (Count IV)

In Count IV, Plaintiff sets forth a claim against Brother Antonucci for tortiously aiding and abetting Liberatore in his sexual abuse of Plaintiff.  Under this theory of liability, based upon section 876 of the Restatement (Second) of Torts, "one is subject to liability for harm to a third person arising from the tortious conduct of another if he (a) does a tortious act in concert with the other or pursuant to a common design with him; (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (c) gives substantial

assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Commw. Ct. 2003).

Plaintiff neither avers, nor has presented evidence, that Brother Antonucci acted with Liberatore in a common scheme or plan.  Subsection (a) is thus inapplicable.

To determine whether Brother Antonucci provided "substantial assistance" to Liberatore, the comments to section 876 of the Restatement provide a list of five factors: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) the defendant's presence or absence at the time of the tort; (4) the defendant's relation to the tortfeasor; and (5) the defendant's state of mind. *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 n. 27 (3d Cir. 1999).  A sixth factor – the duration of the assistance provided – is also considered. *Id.* (citing *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983).

Here, Plaintiff has failed to offer sufficient evidence to allow a reasonable jury to conclude that Brother Antonucci gave substantial assistance or encouragement to Liberatore.  Plaintiff has offered evidence that Brother Antonucci dissuaded Plaintiff and his mother from reporting Liberatore's abuse to the authorities, instead suggesting that Plaintiff forgive Liberatore for his misdeeds.  Under Pennsylvania case law, "substantial assistance" requires that the putative aider or abetter take some affirmative action which causes the tortious actor to conduct himself inappropriately. *Welc v. Porter*, 675 A.2d 334, 338-39 (Pa. Super. Ct. 1996) (holding that the plaintiff, who was injured in a motor vehicle accident with a drunk driver, could not recover from the drunk driver's passenger, as an aider or abetter under section 876(b) of the Restatement, because the plaintiff did

26

not aver that the passenger "engaged in any conduct that substantially assisted or encouraged [the driver] to consume alcohol and operate his vehicle in a negligent or reckless manner"); *see Cruz v. Roberts*, No. CI-04-01947, 2005 WL 1349615, at *235-36 (Pa. C.P. Jan. 26, 2005) (Plaintiff's complaint, arising out of allegations of child sexual abuse by employee of day care center, failed to state claim against the day care center and its owners for tortious aiding and abetting because it "fail[ed] to contain any allegations that the defendants affirmatively acted in any way to assist [the employee] in committing his alleged misdeeds").

Here, there is simply no evidence that Brother Antonucci aided the efforts of Liberatore or encouraged or incited him to commit his abusive acts.  There is no evidence that Brother Antonucci was present during the commission of the abuse.  Moreover, despite Brother Antonucci's advice, Plaintiff and his mother were entirely free to ignore him and contact the authorities on their own accord.  As such, Brother Antonucci's efforts to dissuade Plaintiff and his mother from contacting the authorities cannot be viewed as "substantial assistance."  Accordingly, the Court will grant Brother Antonucci's motion for summary judgment as to Count IV of Plaintiff's Complaint.

## C.      Negligent Hiring, Supervision and Retention (Count V)

Plaintiff next claims that the Diocese, Sacred Heart and Bishop Timlin are liable for negligence in their hiring, supervision and retention of Liberatore as a Diocesan priest.

Under Pennsylvania law, an employer is subject to liability for harm resulting from his conduct if he is negligent or reckless "in the employment of improper persons or instrumentalities in work involving risk of harm to others; . . . in the supervision of the activity; or . . . in permitting, or failing to prevent, negligent or other tortious conduct by

27

persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." *R.A. ex rel. N.A.*, 748 A.2d at 697 (citing RESTATEMENT (SECOND) OF AGENCY § 213 (b), (d) (1958)).  Moreover, a master has a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if (a) the servant is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or is using a chattel of the master, and (b) the master knows or has reason to know that he has the ability to control his servant, and knows or should know of the necessity and opportunity for exercising such control. *R.A. ex rel. N.A.*, 748 A.2d at 697 (citing RESTATEMENT (SECOND) OF TORTS § 317 (a), (b) (1965)).

Accordingly, an employer owes a duty "to exercise reasonable care in selecting, supervising and controlling employees." *Id.*  The Supreme Court of Pennsylvania has held that, "[t]o fasten liability on an employer[,] . . . it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 422 (Pa. 1968) (stating that, in a case in which an employee committed an assault, the employer may be liable for the failure to exercise reasonable care in determining the employee's propensity for violence).

In the instant case, the Diocese, Sacred Heart and Bishop Timlin may be liable if they knew or should have known that Liberatore had a propensity for committing sexual abuse and his employment as Pastor at Sacred Heart might create a situation where his propensity would harm a third person, such as Plaintiff. *See Coath v. Jones*, 419 A.2d

1249, 1250-52 (Pa. Super. Ct. 1980) (holding, in a case in which a former employee of the defendant-employer raped the plaintiff after having gained entry to her home by representing that he was there on the defendant's business, first, that the defendant could be found liable if the perpetrator was known to have the inclination to assault women or if the defendant should have known that, and, second, that "if it were foreseeable by the defendant that [the perpetrator] . . . could attack a customer because he had, on a previous occasion, been admitted to her home on the employer's business, then there would exist a special relationship between defendant and the customer and a duty on the employer to give a reasonable warning to the customer).

When viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in supervising and retaining Liberatore.  However, the Court concludes that a reasonable jury could not find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in hiring Liberatore because there is no evidence suggesting that Liberatore was or would become a child sex predator when he was hired in 1995.

As noted above, under Section 213(b) of the Restatement (Second) of Agency, a principal is liable for harm resulting from his conduct if he is negligent or reckless in the employment of improper persons in work involving risk of harm to others. RESTATEMENT (SECOND) OF AGENCY § 213(b).  Additionally, under Section 213(d) of the Restatement (Second) of Agency, a principal is liable for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons upon his premises. RESTATEMENT (SECOND) OF AGENCY § 213(d).

Here, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury

29

could find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in retaining Liberatore because the jury could conclude that Liberatore was an improper person who posed a risk of sexual abuse to minor males.  A reasonable jury could also find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons on church premises based on Liberatore's sexual abuse of Plaintiff in the Sacred Heart Rectory.

There is evidence that Bishop Timlin was informed that Plaintiff was sleeping in Liberatore's bedroom at the Rectory and that Liberatore had taken Plaintiff on several overnight trips (O'Neill Letter).  Bishop Timlin acknowledged that he would characterize such activity as grooming behavior. (Timlin Dep. 36:8-37:9.)  Bishop Timlin was informed of Liberatore's inappropriate behavior with Roe and Poe. (Bohr Dep. 42:8-43:11; Summary at 2.)  Shortly thereafter, Bishop Timlin removed Liberatore from the Seminary. However, rather than dismiss Liberatore as a Diocesan priest, Bishop Timlin assigned him to another parish within the Diocese.  Based on this evidence, a reasonable jury could infer that this provided Liberatore the opportunity to befriend Plaintiff and then sexually abuse him.

Further, the awareness of the potential Liberatore posed as a pedophile raises the question of the relevance of the Diocese's and Bishop Timlin's awareness of Liberatore's behavior with Roe.  The Court finds it relevant for the following reasons.

A Roman Catholic priest takes a vow of celibacy at his ordination and, therefore, is called to refrain from any and all sexual activity. Wikipedia, *supra*, "Clerical Celibacy", http://en.wikipedia.org/wiki/Celibacy#Clerical_celibacy.  While any sexual act outside the sacrament of marriage is forbidden by the Church, Wikipedia, *supra*, "Roman Catholic

Church", http://en.wikipedia.org/wiki/Roman_Catholic_Church#Sexuality, homosexual acts are considered to be "intrinsically immoral" and "contrary to the natural law." Wikipedia, *supra*, "Instruction Concerning the Criteria for the Discernment of Vocations with regard to Persons with Homosexual Tendencies in view of their Admission to the Seminary and to Holy Orders", http://en.wikipedia.org/wiki/Instruction_Concerning_the_Criteria_for_the_Discernment_of_Vocations_with_regard_to_Persons_with_Homosexual_Tendencies_in_view_of_their_Admission_to_the_Seminary_and_to_Holy_Orders.  Indeed, the Church forbids the ordination of men to the priesthood who have "deeply rooted homosexual tendencies." Wikipedia, *supra*, "List of Christian denominational positions on homosexuality", http://en.wikipedia.org/wiki/List_of_Christian_denominational_positions_on_homosexuality#Roman_Catholic_Church.  Nevertheless, in general, homosexual behavior between consenting adults does not violate the rules of civil society.

It does not follow that a homosexual is more likely than a heterosexual to prey on minors of the same sex.  As such, standing alone, Liberatore's homosexual behavior with regard to Roe, an adult, would be irrelevant as to the issue of whether the Diocesan Defendants had notice that Liberatore had a propensity to sexually abuse a minor male. However, Liberatore's behavior with regard to Roe becomes relevant, as to the issue of notice to the Diocesan Defendants, by virtue of the fact that it was strikingly similar to that which he later engaged in with regard to Plaintiff.

Liberatore was in Roe's company a great deal, bought Roe expensive gifts, took Roe on overnight trips and had Roe sleep in his room at the Seminary.  This behavior was noticed by colleagues, who, in turn, made their observations and concerns known to

the Diocesan Defendants.  While at Sacred Heart, Liberatore counseled Plaintiff

regarding the death of his father, hired Plaintiff as a sacristan, was in Plaintiff's company

an inordinate amount of time, purchased expensive gifts for Plaintiff, took Plaintiff on

overnight trips and had Plaintiff sleep in his room at the Rectory.  Like his relationship

with Roe, Liberatore's relationship with Plaintiff drew comment from people who were in a

position to view, on a daily basis, much of what occurred between them.  These people,

in turn, informed the Diocese, Sacred Heart and Bishop Timlin of their observations and

concerns.

Accordingly, Liberatore's homosexual behavior with regard to Roe is legally

relevant as to the issue of whether the Diocese, Sacred Heart and Bishop Timlin had

notice that Liberatore was, at the very least, grooming Plaintiff for a homosexual

relationship, if not already involving him in one.

However, even ignoring Liberatore's relationship with Roe, a reasonable jury could

conclude that there was adequate warning to the Diocese, Sacred Heart and Bishop

Timlin that Liberatore was grooming Plaintiff for a homosexual relationship, and that it

may well have already begun.  The notice of Plaintiff's sleepovers in the Rectory, the gifts

given to Plaintiff and the overnight trips is sufficient to allow a reasonable jury to conclude

that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in retaining

Liberatore as a Diocesan priest.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury

could also conclude that the Diocese, Sacred Heart and Bishop Timlin were negligent or

reckless in permitting, or failing to prevent, Liberatore's tortious conduct upon church

premises, given Plaintiff's statement that Liberatore routinely sexually abused him while

they slept in Liberatore's bedroom in the Sacred Heart Rectory.

Further, the Court cannot conclude as a matter of law that the Diocese, Sacred Heart and Bishop Timlin are not liable under Section 317 of the Restatement (Second) of Torts, as a reasonable jury could conclude that these defendants knew of the necessity and had the opportunity and ability to control Liberatore's actions, but nevertheless failed to exercise reasonable care to prevent Liberatore, acting outside the scope of his employment, from intentionally harming Plaintiff while on church premises.  Given the evidence of Bishop Timlin's awareness of Liberatore's relationship with Roe, Plaintiff's sleeping in Liberatore's bedroom at the Rectory and the overnight trips on which Liberatore had taken Plaintiff, a reasonable jury could conclude that the Diocese, Sacred Heart and Bishop Timlin had reason to believe that Liberatore was, at the very least, grooming this young man, if not already involving him in a sexual relationship.

Consequently, Count V of Plaintiff's Complaint will survive summary judgment to the extent that Plaintiff claims that the Diocese, Sacred Heart and Bishop Timlin were negligent in supervising and retaining Liberatore.  The Court will grant summary judgment as to Count V of Plaintiff's Complaint to the extent that Plaintiff claims that Liberatore was negligently hired.

### D.   Negligence *Per Se* (Count VI)

In Count VI of his Complaint, Plaintiff sets forth a claim of negligence *per se* arising from Defendants' alleged violation of the Child Protective Services Act, 23 PA. CONS. STAT. ANN. § 6311.  Specifically, Plaintiff alleges that the Diocesan Defendants and Brother Antonucci failed to comply with the reporting requirements of section 6311. The Diocesan Defendants and Brother Antonucci now move this Court for summary

judgment as to this count.  The Diocesan Defendants argue that they never "came into

contact" with Plaintiff and thus were not subject to section 6311.  Brother Antonucci

asserts that, because he was not employed by the Diocese as a priest, he too was not

subject to the reporting requirement imposed by section 6311.

Section 6311 provides, in pertinent part:

> Persons who, in the course of their employment, occupation
> or practice of their profession, come into contact with children
> shall report or cause a report to be made in accordance with
> section 6313 (relating to reporting procedure) when they have
> reasonable cause to suspect, on the basis of their medical,
> professional or other training and experience, that a child
> coming before them in their professional or official capacity is
> an abused child.

23 PA. CONS. STAT. ANN. § 6311(a).  Under section 6311(b), "persons required to report

under subsection (a) include, but are not limited to, any . . . member of the clergy." 23 PA.

CONS. STAT. ANN. § 6311(b).  As is clear from its language, subsection (b) recites an

inclusive, rather than exclusive, list of those persons required to report.

Under Pennsylvania law, the elements of a negligence *per se* action are: (1) the

purpose of the statute must be, at least in part, to protect the interest of the plaintiff,

individually, as opposed to the public; (2) the statute must clearly apply to the conduct of

the defendant; (3) the defendant must violate the statute; and (4) the violation of the

statute must proximately cause the plaintiff injury. *Jordan v. City of Philadelphia*, 66 F.

Supp. 2d 638, 644 (E.D. Pa. 1999).  After analyzing these factors, the Court is of the

opinion that, when the evidence is viewed in the light most favorable to Plaintiff, a

reasonable jury could conclude that the Diocesan Defendants and Brother Antonucci

violated section 6311.

34

The first element of Plaintiff's negligence *per se* action is easily met.  Section 6311 was clearly promulgated so as to protect abused children such as Plaintiff. *J.E.J. v. Tri-County Big Brothers/Big Sisters, Inc.*, 692 A.2d 582, 586 (Pa. Super. Ct. 1997).

Second, clergy are expressly included within the list of individuals who have a duty to report suspected child abuse. 23 PA. CONS. STAT. ANN. § 6311(b).  As such, the statute clearly applies to the Diocesan Defendants.

The Court is also of the opinion that Brother Antonucci, a benedictine monk who was hired by Liberatore to serve as a cantor, custodian and cook at Sacred Heart, but did not serve in a clerical capacity, was a person required to report under section 6311. While Brother Antonucci was not a clergyman within the Diocese, section 6311(b) does not so limit the clergymen included within its reach.  Indeed, the statute requires "any . . . member of the clergy" to report suspected child abuse.  The Court does not interpret this provision to include only ordained priests within the Diocese and Brother Antonucci cites no case law so limiting the reach of section 6311.  Brother Antonucci not only was a consecrated monk and hermit but, according to Plaintiff, he also held himself out to Plaintiff as a religious and spiritual advisor.  In addition, the statute's intent is to require those persons who come into contact with children during the course of their employment to report suspected abuse.  Here, there is no question that, during the course of his employment with Sacred Heart, Brother Antonucci did in fact come into contact with children, including Plaintiff.  As such, the Court concludes that the Child Protective Services Act clearly applied to Brother Antonucci.

Third, a reasonable jury could find that Defendants violated the statute.  Viewing the record in the light most favorable to Plaintiff, there is evidence which supports the

conclusion that Defendants had "reasonable cause to suspect" that Liberatore was

sexually abusing Plaintiff.  The Diocesan Defendants were informed of Liberatore's past

incidents involving Roe and Poe.  They had also been informed of the fact that Plaintiff

was sleeping in Liberatore's bedroom in the Rectory.  In addition, several people had

voiced their own concerns and suspicions regarding the relationship between Liberatore

and Plaintiff, and supported these suspicions with their own personal observations of

Liberatore's behavior towards Plaintiff.  As Plaintiff was a parishioner, alter server and

sacristan at Sacred Heart, and the reports concerned a Diocesan priest's abuse, the

Diocesan Defendants were in sufficient "contact" with Plaintiff to bring them within the

reporting requirements of the Child Protective Services Act.  As for Brother Antonucci,

Plaintiff directly told him of Liberatore's sexual abuse.  As such, Plaintiff "came into

contact" with Brother Antonucci.  Accordingly, there was sufficient evidence within the

knowledge of Defendants to create "reasonable cause to suspect" that Liberatore was

sexually abusing Plaintiff.  As it is uncontested that Defendants did not report Liberatore's

suspected abuse of Plaintiff to law enforcement authorities, a reasonable jury could

conclude that Defendants violated section 6311 of the Child Protective Services Act.

Fourth, when viewing the evidence in the light most favorable to Plaintiff, a

reasonable jury could find that Defendants' failure to report Liberatore's sexual abuse of

Plaintiff, in violation of section 6311, proximately caused the injuries Plaintiff suffered.

Liberatore was convicted of sexual abuse, indecent assault and corruption of minors

based on his May 2002 assaults upon Plaintiff.  The Diocesan Defendants knew as early

as January of 2001 that Plaintiff was sleeping in Liberatore's bedroom at the Rectory.

Plaintiff also stated in his deposition that he told Brother Antonucci, prior to May of 2002,

that Liberatore was sexually abusing him.  As such, a reasonable jury could find that, had

Defendants reported Liberatore to law enforcement authorities, Liberatore would not have

had the opportunity to sexually abuse Plaintiff in May of 2002.  Summary judgment as to

Count VI is thus inappropriate and will be denied.

### E.      Intentional Infliction of Emotional Distress (Count VII)

In Count VII, Plaintiff asserts a claim of intentional infliction of emotional distress

against Liberatore, the Diocese, Sacred Heart, Bishop Timlin, Father Kopacz and Brother

Antonucci.  The Diocesan Defendants, as well as Brother Antonucci, now move the Court

to grant summary judgment as to this claim.

"To prove a claim of intentional infliction of emotional distress, the following

elements must be established: (1) the conduct must be extreme and outrageous; (2) it

must be intentional or reckless; (3) it must cause emotional distress; (4) that distress

must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. 1997).  Extreme and

outrageous conduct is conduct which is "so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized society." *Strickland v. University of

Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997).  Generally, "the case is one in which

the recitation of the facts to an average member of the community would arouse his

resentment against the actor, and lead him to exclaim, 'outrageous'!" *Id.*  In addition, to

prevail on an intentional infliction of emotional distress cause of action, a plaintiff must

provide competent medical evidence to prove the existence of emotional distress.

*Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987); *see Hunger v.*

*Grand Central Sanitation*, 670 A.2d 173 (Pa. Super. Ct. 1996) (holding that, to prevail on intentional infliction of emotional distress claim, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the plaintiff suffered a medically confirmed injury).

In this case, Plaintiff has failed to present competent medical evidence to support his claim of severe emotional distress, as required under Pennsylvania law.  As such, the Court will grant summary judgment as to Count VII of Plaintiff's Complaint.

### F.     Breach of Fiduciary Duty (Count VIII)

#### 1. Introduction

In Count VIII, Plaintiff alleges that Defendants Liberatore, the Diocesan Defendants and Brother Antonucci breached their respective fiduciary duties to Plaintiff. Plaintiff argues that the Diocesan Defendants, as well as Brother Antonucci, breached their fiduciary duties that were owed to Plaintiff by placing Liberatore in a position to serve as Plaintiff's priest and counselor, by failing to remove Liberatore from that position, and by failing to report Liberatore to law enforcement authorities after having ample reason to believe Liberatore had committed acts of sexual abuse.  Plaintiff contends that the Diocesan Defendants and Brother Antonucci, rather than act in his best interest, chose rather to act in their own interests by ignoring and even attempting to conceal Liberatore's sexual abuse of a minor.  The Diocesan Defendants have moved for summary judgment as to this count, arguing that Pennsylvania does not recognize a claim for breach of fiduciary duty in a case similar to this one.  Brother Antonucci also moves for summary judgment, asserting that the facts do not support Plaintiff's claim.

Under Pennsylvania law, "[t]he general test for determining the existence of . . . a [fiduciary] relationship is whether it is clear that the parties did not deal on equal terms." *Frowen v. Blank*, 425 A.2d 412, 416 (Pa. 1981).  Indeed, a fiduciary relationship "is not confined to any specific association of the parties." *Leedom v. Palmer*, 117 A. 410, 411 (Pa. 1922)  Rather, a fiduciary relationship will be found to exist "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible." *Id.*; *see also In re Estate of Clark*, 359 A.2d 777, 781 (Pa. 1976) (a fiduciary relationship exists "as a matter of fact whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other"); *Drob v. Jaffe*, 41 A.2d 407, 408 (Pa. 1945) (a fiduciary relationship "exists wherever one occupies toward another such a position of advisor or counsellor [sic] as reasonably to inspire confidence that he will act in good faith for the other's interest").  One in a fiduciary relationship with another is under a duty to act solely in the interest of that person. *McCarrell v. Cumberland County Employee's Retirement Bd.*, 547 A.2d 1293, 1296 (Pa. Commw. Ct. 1988); *see also Leedom*, 117 A. at 411 (a fiduciary relationship "is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself").  Failure to act in the other's interest results in breach of the duty imposed by the fiduciary relationship. RESTATEMENT (SECOND) OF TORTS § 874 (1979).

The Supreme Court of Pennsylvania has not determined whether or not there is a

39

cause of action for breach of fiduciary duty against a priest or diocese. *See Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 582 (W.D. Pa. 2004).  Consequently, the Court "must don the soothsayer's garb and predict how [the Supreme Court of Pennsylvania] would rule if it were presented with the question." *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir. 2001).  In making this prediction, the Court should consider decisions of the intermediate and trial courts of the state, federal courts interpreting the particular area of the law in question, and other state supreme courts that have addressed the matters raised. *Wiley v. State Farm Fire & Casualty Co.*, 995 F.2d 457, 459 (3d Cir. 1993).

### 2. The Courts of Pennsylvania

Decisions of the intermediate and trial courts of Pennsylvania provide support for the conclusion that the Supreme Court of Pennsylvania would recognize Plaintiff's breach of fiduciary duty claim against Liberatore and the Diocesan Defendants.  These decisions suggest a rule holding that, when a plaintiff had a special relationship with the defendant priest and diocese, such as counseling or participation in church-sponsored activities, a fiduciary relationship will be found to exist and the plaintiff's breach of fiduciary duty claim will be recognized.

The Superior Court of Pennsylvania has on two occasions refused to find a fiduciary relationship between parishioners and the diocese in actions arising from alleged acts of sexual abuse perpetrated by diocesan priests. *See Meehan v. Archdiocese of Philadelphia*, 870 A.2d 912, 922 n. 9 (Pa. Super. Ct. 2005); *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 279 n. 4 (Pa. Super. Ct.

40

2005).  In both *Meehan* and *Baselice*, the plaintiffs, victims of alleged sexual abuse by diocesan priests, had waited until long after the statute of limitations had expired to pursue their claims. 870 A.2d at 917-18; 879 A.2d at 278-79.  The plaintiffs in both cases argued that they had a fiduciary relationship with their dioceses, and that, due to this relationship and the dioceses' general and systematic concealment of the offending priests' misconduct, the doctrine of fraudulent concealment tolled the statute of limitations. *Meehan*, 870 A.2d at 921-22; *Baselice*, 879 A.2d at 278-79.  The Superior Court on both occasions rejected the plaintiffs' contentions, holding that the plaintiffs' relationships with their dioceses, that of mere parishioners, did not constitute fiduciary relationships. *Meehan*, 870 A.2d at 922 n. 9; *Baselice*, 879 A.2d at 279 n. 4.  The court reasoned that the plaintiffs' relationships with their dioceses were too general in nature, and, thus, did not rise to the higher level associations involved in fiduciary relationships such as attorney and client, doctor and patient, or clergy and penitent. *Meehan*, 870 A.2d at 922 n. 9; *Baselice*, 879 A.2d at 279 n. 4.  As a counseling relationship is substantially similar to the priest-penitent relationship, the Superior Court's comparison of the plaintiff-parishioners' general – parishioner qua parishioner – relationship with their dioceses to the "specific, legally recognized higher level association" that characterizes a priest-penitent relationship suggests that the Superior Court would recognize a breach of fiduciary duty claim brought by a plaintiff against a priest and diocese when there existed a counseling or other special relationship above that of simply a parishioner.

The Pennsylvania Courts of Common Pleas have on three occasions recognized a claim against a priest or diocese for breach of fiduciary duty. *See Morrison v. Diocese of*

*Altoona-Johnstown*, 68 Pa. D. & C. 4th 473, 2004 WL 3141330 (Pa. C. P. Oct. 20, 2004);

*Nardella v. Dattilo*, 36 Pa. D. & C. 4th 364, 1997 WL 1056878 (Pa. C. P. Mar. 21, 1997)

(en banc); *Podolinski v. Episcopal Diocese of Pittsburgh*, 23 Pa. D. & C. 4th 385, 1995

WL 610296 (Pa. C. P. Mar. 22, 1995).

In *Morrison v. Diocese of Altoona-Johnstown*, the court held that the plaintiff-

parishioner had stated a claim for breach of fiduciary duty against the diocese and its

officials in two respects. 68 Pa. D. & C. 4th at 491, 2004 WL 3141330.  First, the plaintiff,

who had reported to diocesan officials that a priest had sexually abused him while the

plaintiff was a minor, had stated a claim for breach of fiduciary duty stemming from the

diocesan officials' failure to uphold their promise that the priest would be denied future

opportunities to come into contact with children. *Id.*  The court reasoned that the

diocesan officials' representations could have resulted in the creation of a fiduciary duty

to plaintiff because a reasonable fact-finder could conclude that the officials'

representations were intended to placate the plaintiff in order to gain his trust and thereby

lessen the likelihood that he would bring legal action against them. *Id.*  The court also

recognized the plaintiff's claim for breach of fiduciary duty that arose from the diocesan

officials' failure to uphold their unconditional promise to pay for the plaintiff's

psychological counseling. *Id.* at 491-92.

In *Nardella v. Dattilo*, the court held that the plaintiff-parishioner, an adult woman,

had stated a claim against her priest, the diocese, and diocesan officials for breach of

fiduciary duty arising from the sexual relationship that developed between the plaintiff and

priest during counseling sessions regarding the death of the plaintiff's mother. 36 Pa. D.

& C. 4th at 380-82, 1997 WL 1056878, at *10.  The court found persuasive the plaintiff's argument that the priest breached his fiduciary duty, a duty that was owed to her as her counselor and priest, by acting in a manner not to benefit the plaintiff, but, rather, to satisfy his own sexual needs. *Id.* at 381, 1997 WL 1056878, at *10.  The court also allowed the plaintiff's claim against the diocese and its officials to go forward on the ground that these defendants breached their fiduciary duty to the plaintiff by placing the priest "in a position to serve as [the plaintiff's] counselor, knowing of her vulnerability and [the priest's] past sexual misconduct." *Id.* at 381, 1997 WL 1056878, at *10.

However, in *Podolinski v. Episcopal Diocese of Pittsburgh*, the court held that, while the plaintiff-parishioner's breach of fiduciary duty claim could go forward against the priest based on the sexual relationship that arose between them during marriage counseling sessions, the plaintiff-parishioner's breach of fiduciary duty claim against the diocese and its officials, arising from the improper manner, under church canons, in which the plaintiff's accusation against the priest was handled by these defendants, as well as the outcome of the diocese's investigatory and disciplinary procedures, was precluded by the First Amendment. 23 Pa. D. & C. 4th at 408-11, 1995 WL 610296, at *13-15.  The court reasoned that an adjudication on this claim would require it to inquire into the decision of church authorities on matters of "discipline, faith, internal organization or ecclesiastical rule, custom or law." *Id.*, 1995 WL 610296, at *13-15.

### 3. Federal Courts and Supreme Courts of Other States

"[T]he federal and state supreme courts that have considered a breach of fiduciary duty claim . . . uniformly have rejected attempts to found the cause of action merely on

the relationship between parishioners and members of the clergy." *Gaines*, 354 F. Supp. 2d at 582, 584 ("it has consistently been recognized that the mere existence of a pastor-parishioner relationship does not in itself give rise to a fiduciary duty").  Moreover, several courts have refused to recognize breach of fiduciary duty claims brought against priests or dioceses on the ground that such claims offend the First Amendment. *Id.* at 583. However, some courts have been more willing to recognize breach of fiduciary duty claims in cases in which there is a special relationship between the plaintiff-parishioner and the defendant priest or diocese, such as when the plaintiff-parishioner received counseling from a diocesan priest or participated in church-sponsored activities. *See id.* at 583-85.

In *Gaines v. Krawczyk*, the United States District Court for the Western District of Pennsylvania held that the Supreme Court of Pennsylvania would not recognize a breach of fiduciary duty claim in a case in which a priest furnished alcohol to a minor college student, who subsequently fell to his death from a crawlspace in the church. 354 F. Supp. 2d at 582-85.  The court reasoned that, because there was no counseling relationship, nor any special relationship for that matter, between the priest and minor student, there was no fiduciary relationship that could be breached. *Id.* at 584-85.  The court explained that "the mere existence of a pastor-parishioner relationship does not in itself give rise to a fiduciary duty." *Id.* at 584.  Rather, something more, such as a counseling relationship or other additional or special relationship which causes the parishioner to repose trust and confidence in the priest, is required to create a fiduciary relationship. *Id.*; *see Doe v. Hartz*, 52 F. Supp. 2d 1027, 1065 (N.D. Iowa 1999) (interpreting Iowa law, dismissed

44

breach of fiduciary duty claim because the plaintiff merely alleged a priest-parishioner relationship, and not a counseling relationship); *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337 (5th Cir. 1998) (interpreting Texas law, permitted breach of fiduciary duty claim against minister because claim arose out of a counseling relationship, not merely a priest-parishioner relationship).

A fiduciary relationship was found to exist by the United States Court of Appeals for the Second Circuit in *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) (interpreting Connecticut law).  In *Martinelli*, the plaintiff, who was fourteen (14) at the time of the alleged sexual abuse, brought an action against the diocese alleging that a priest in his parish used his position of trust to induce members of a church youth group, including the plaintiff, to engage in sexual relations with him. *Id.* at 414.  After a jury found that a fiduciary relationship existed between the plaintiff and the diocese, the United States Court of Appeals for the Second Circuit upheld this verdict on appeal, finding that the relationship between the plaintiff and the diocese was fiduciary in nature. *Id.* at 429.  The court supported its conclusion that a fiduciary relationship existed on the grounds that the diocese sponsored and encouraged the abusive priest's contact with the youth of the parish, the plaintiff attended a Catholic school within the diocese, participated in church activities, and had been taught throughout grade school catechism classes to trust and respect the bishop of the diocese. *Id*.

In *Fortin v. The Roman Catholic Bishop of Portland*, 871 A.2d 1208 (Me. 2005), the Supreme Judicial Court of Maine held that a victim of child sexual abuse perpetrated by a priest could pursue a breach of fiduciary duty claim against the diocese, finding that

the plaintiff had a fiduciary relationship with the diocese based upon his "prolonged and extensive involvement with the church as a student and altar boy" which distinguished him from a plaintiff "who asserts nothing more than general membership in a religious organization." *Id.* at 1220.  The court continued, "[a] child who is both a student and an altar boy is subject to the supervision, control and authority of the Diocese on a daily basis.  At its very core, this is a relationship marked by the 'great disparity of position and influence between the parties' that is a hallmark of a fiduciary relationship." *Id.*; *see F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997) (holding that plaintiff-parishioner stated cause of action for breach of fiduciary duty against a church rector based on the inappropriate sexual relationship that developed between them while the rector was counseling the parishioner); *Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988) (holding that the plaintiff, who had engaged in a sexual relationship with the Catholic priest who was counseling her, stated a cause of action for breach of fiduciary duty); *Erickson v. Christenson*, 781 P.2d 383, 386 (Or. Ct. App. 1989) (recognizing plaintiff's breach of fiduciary duty claim against pastor who seduced her through counseling relationship).

As noted above, several courts have refused to recognize breach of fiduciary duty claims brought against priests or dioceses because such claims offend the First Amendment. *See Gaines*, 354 F. Supp. 2d at 583 (citing *Dausch v. Rykse*, 52 F.3d 1425, 1438 (7th Cir. 1994)); *Teadt v. Lutheran Church Missouri Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999) (refusing to recognize the plaintiff's breach of fiduciary duty cause of action against a member of the clergy, arising from her sexual relationship with her minister, on First Amendment grounds, reasoning that the plaintiff could not establish any

imbalance of power in the relationship or explain why she would repose trust in the minister without resorting to religious facts); *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436 (N.Y. Sup. Ct. 1998) (refusing to recognize the plaintiff's breach of fiduciary duty cause of action against a member of the clergy, arising from a priest's alleged sexual misconduct, on First Amendment grounds, reasoning that it would be impossible to show the existence of a fiduciary relationship, based on the plaintiff's repose of trust in the priest, without resort to religious facts); *H.R.B. v. J.L.G.*. 913 S.W.2d 92, 98 (Mo. Ct. App. 1995) (refusing to recognize the plaintiff's breach of fiduciary duty action against church for clergy sexual misconduct because "defining the scope of fiduciary duty owed persons by their clergy . . . would require courts to define and express the standard of care followed by reasonable clergy of the particular faith involved, which in turn" would result in the court's excessive entanglement with religion); *Schieffer v. Catholic Archdiocese of Omaha*, 508 N.W.2d 907, 911 (Neb. 1993) (refusing to recognize the plaintiff's breach of fiduciary duty cause of action against a member of the clergy, arising from the priest's alleged sexual misconduct, on First Amendment grounds, reasoning that, if it were to recognize such an action, the court would be confronted with the task of articulating the generalized standard of care for a clergyman required by the law of negligence).

These courts reject a breach of fiduciary duty claim on First Amendment grounds for one of two reasons.  First, some courts hold that it is impossible for a plaintiff-parishioner to establish the existence of a fiduciary relationship with a priest or diocese without impermissibly resorting to religious understandings to demonstrate the necessary disparity in position and influence or explain why he reposed trust and confidence in the

priest and diocese. *See e.g., Teadt*, 603 N.W.2d at 823; *see also* Ira C. Lupu & Robert

W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 B.Y.U. L. REV. 1789,

1827-28 (2004) ("To determine whether a religious relationship should give rise to a

fiduciary obligation, a court would [impermissbly] need to examine the religious

understandings of parishioner and priest").  Other courts reason that, if a breach of

fiduciary duty claim were recognized, it would be necessary to define a reasonable duty

standard and then evaluate a defendant-priest's conduct against that standard, *Dausch*,

52 F.3d at 1438 (claim for "clergy malpractice" is not recognized under Illinois law),

resulting in excessive government entanglement with religion in violation of the First

Amendment. *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198,

205 (Utah 2001); *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 453 (Tex. App.

2000).

However, as mentioned above, an equal, if not greater, number of courts allow a

breach of fiduciary duty claim when there exists a special relationship between the priest

and parishioner, notwithstanding the First Amendment. *See e.g., Mabus v. St. James

Episcopal Church*, 884 So.2d 747, 757, 760-61 (Miss. 2004) (affirming trial court's finding

that plaintiff-parishioner's claim for breach of fiduciary duty is not prohibited by the First

Amendment, but that a priest may not be held to be in a fiduciary relationship merely

based upon his status as a priest, as recognizing such a duty on the basis of a position

held within the church would require the court to define a reasonable standard of care

and evaluate a priest's conduct compared to that standard, in violation of the First

Amendment).

These courts reason that, when a breach of fiduciary duty claim arises from the priest's allegedly having used a parishioner's trust in him to his own advantage, rather than to the parishioner's benefit, all a court need ask is whether there is dealing on unequal terms based on the parishioner's trust, justifiably reposed, and whether that trust has been breached. *See Moses v. Diocese of Colorado*, 863 P.2d 310, 321 n.13 (Colo. 1993) ("the relevant facts are that the defendants . . . occupied a position of superiority, assumed a duty to act in good faith, and then breached their duty").  Such inquiries are religion-neutral as they "involve[ ] purely secular conduct that is analogous to an intentional tort and does not hinge on ecclesiastical matters." *Gaines*, 354 F. Supp. 2d at 583.  A court also need not define a reasonable standard of care or inquire as to whether the defendant-priest has breached that standard, one of the inquiries that several courts have held to result in the government's excessive entanglement with religion. *Moses*, 863 P.2d at 321 n. 13.  As such, these courts conclude that the recognition of a breach of fiduciary duty claim in the presence of a special relationship does not offend the First Amendment. *See Martinelli*, 196 F.3d at 430-32 ("[t]he First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters").  Moreover, as the Florida Supreme Court recently explained, to hold that the First Amendment effectively immunizes church defendants from suit "could risk placing religious institutions in a preferred position over secular institutions, a concept both foreign and hostile to the First Amendment." *Malicki v. Doe*, 814 So. 2d 347, 365 (Fla. 2002).

49

### 4. Prediction

In light of the Supreme Court of Pennsylvania's definition of what constitutes a fiduciary relationship, *see Leedom*, 117 A. at 411 (a fiduciary relationship will be found to exist "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible"), the Court is of the opinion that the Supreme Court of Pennsylvania would recognize Plaintiff's breach of fiduciary duty claim against Liberatore and the Diocesan Defendants.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was more than a mere parishioner and that Liberatore and the Diocesan Defendants exerted an overmastering influence over Plaintiff, or that Plaintiff exhibited weakness, dependence on or justifiable trust in Liberatore and the Diocesan Defendants. Additionally, the Court is of the opinion that the Supreme Court of Pennsylvania would hold that Plaintiff's breach of fiduciary duty claims do not offend the First Amendment. Consequently, the Court will deny the Diocesan Defendants' motion for summary judgment as to Count VIII of Plaintiff's Complaint.

As previously stated, under Pennsylvania law, a fiduciary relationship exists "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible." *Leedom*, 117 A. at 411; *see also Estate of Clark*, 359 A.2d at 781 (a fiduciary relationship exists "whenever one person has reposed a special confidence in another to the extent that the parties do not

deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other").

This definition fits the relationship of a priest and a parishioner once the priest "accepts the parishioner's trust and accepts the role of counselor." *Moses*, 863 P.2d at 322-23. In such a case, the parishioner has justifiably placed his trust in the priest. In order to receive and make use of a priest's advice and counsel, a parishioner must necessarily depend upon the priest's knowledge and expertise, resulting in the priest's superiority and influence over the parishioner. Thus, once a counseling relationship has commenced, the parishioner and priest no longer deal on equal terms. This unequal relationship affords the priest opportunity to abuse the trust and confidence reposed in him or prey on a weak and dependent parishioner to his own benefit. The relationship therefore becomes fiduciary in nature and the recognition of a breach of fiduciary duty claim is necessary to protect a beholden parishioner from a self-serving priest. Moreover, the Pennsylvania Courts of Common Pleas have, in all three cases in which it was faced with the issue, recognized a breach of fiduciary duty claim against a priest accused of sexual misconduct. *See Morrison*, 68 Pa. D. & C. 4th 473, 2004 WL 3141330; *Nardella*, 36 Pa. D. & C. 4th 364, 1997 WL 1056878; *Pololinski*, 23 Pa. D. & C. 4th 385, 1995 WL 610296.

As to a diocese and its officials, a diocese exerts an overmastering influence over a plaintiff, or a plaintiff exhibits weakness, dependence on or justifiable trust in the diocese and its officials when, as here, the plaintiff is a minor and is involved in the church beyond that of a mere parishioner, whether by virtue of his serving the church, participating in church-sponsored activities, or receiving counseling from a priest. When

51

the plaintiff is a minor, the power differential between the plaintiff and priest is magnified. This power differential makes it difficult for a minor who is involved in the church to refuse the unwelcome sexual advances of a priest or report such an advance to his parents or the authorities. *See Schneider v. Plymouth State College*, 744 A.2d 101 (N.H. 1999) (holding that college owed a fiduciary duty to student, and that this duty was breached by sexual harassment of the student by a professor; noting that students are in a vulnerable situation because the power differential between faculty and students makes it difficult for students to refuse unwelcome sexual advances, thus necessitating college's duty to create a safe learning environment).  Minors participating in church activities are therefore dependent on the diocese for protection, and the diocese is responsible to provide it.  This vulnerability requires the diocese to be vigilant so that minors who are serving the church, participating in church activities, or receiving counseling from a diocesan priest are doing so in an environment free from the threat of sexual abuse. *See Nardella*, 36 Pa. D. & C. at 381, 1997 WL 1056878, at *10 (allowing plaintiff's breach of fiduciary duty claim to go forward against diocese and its officials on the ground that these defendants placed the priest "in a position to serve as [the plaintiff's] counselor, knowing of her vulnerability and [the priest's] past sexual misconduct").

The recognition of Plaintiff's breach of fiduciary duty claim against Liberatore and the Diocesan Defendants does not offend the First Amendment.  Plaintiff's breach of fiduciary duty claim only raises the issues of whether the parties did not deal on equal terms, but, rather, on the one side there was an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible, whether that unfair advantage was exploited by Liberatore, and whether the

52

Diocesan Defendants failed to provide and maintain a safe environment for Plaintiff to participate in church activities. *See Moses*, 863 P.2d at 321 n. 13; *Leedom*, 117 A. at 411; *Schneider*, 744 A.2d at 105-06.  No inquiry need be made into church doctrine or other ecclesiastical matters.  No professional standard of care need be set for clergy. There is no risk of excessive governmental entanglement with religion.

The *Podolinski* case is not to the contrary.  There, the Court of Common Pleas dismissed the plaintiff-parishioner's breach of fiduciary duty claim based upon the diocesan officials' failure to adhere to church canons when dealing with the plaintiff's complaint of a priest's sexual misconduct, as precluded by the First Amendment. 23 Pa. D. & C. 4th at 408-11; 1995 WL 610296, at *13-15.  As is obvious, the plaintiff's theory of liability in *Podolinski* – that the diocesan officials violated church canons – would "necessarily involve an inquiry into the propriety of the decisions of church authorities on matters of discipline, internal organization, ecclesiastical rule, custom, and law." *Id.* at 411; 1995 WL 610296, at *15.  Consequently, the Court finds *Podolinski* inapposite.

Accordingly, the Court concludes that the Supreme Court of Pennsylvania would recognize Plaintiff's breach of fiduciary duty claims against Liberatore and the Diocesan Defendants, and that such claims do not offend the First Amendment.  Therefore, the Court will deny the Diocesan Defendants' motion for summary judgment as to Count VIII of Plaintiff's Complaint.

However, the Court will grant Brother Antonucci's motion for summary judgment as to Count VIII of Plaintiff's Complaint.  Plaintiff stated in his deposition that he informed Brother Antonucci of Liberatore's sexual abuse.  Rather than encourage Plaintiff to

contact the police or tell his mother, Brother Antonucci instructed Plaintiff "to forgive [Liberatore], to keep the issue private, and to not let other people know because it would ruin [Plaintiff's] life and [the lives of] others."  In essence, Plaintiff claims that this was bad advice and that, by giving this advice to Plaintiff, Brother Antonucci became liable to Plaintiff for breach of fiduciary duty.  However, Plaintiff's claim is only a restatement of the claim of clergy malpractice, a professional negligence claim which is barred by the First Amendment and not recognized in Pennsylvania. *See Podolinski*, 23 Pa. D. & C. 4th at 399-400, 1995 WL 610296, at *8.  As such, the Court will grant Brother Antonucci's motion for summary judgment as to Count VIII of Plaintiff's Complaint.

## IV.    Plaintiff's Punitive Damages Claim

In his Complaint, Plaintiff seeks that punitive damages be imposed against the Diocesan Defendants and Brother Antonucci.  The Diocesan Defendants move this Court to grant summary judgment in their favor as to this claim.

Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984).  "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchinson ex rel. Hutchinson v. Luddy*, 870 A.2d 766, 770 (Pa. 2005).  In determining whether punitive damages are warranted in a particular case, "[t]he state of mind of the actor is vital.  The act, or the failure to act, must be intentional, reckless or malicious." *Id.* at 771.  An appreciation of the risk is a necessary element of the mental state required

for the imposition of punitive damages. *Id.* at 772.  As such, a showing of mere

negligence, or even gross negligence, will not suffice to establish that punitive damages

should be imposed. *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).  However,

notwithstanding this heightened standard, punitive damages may be awarded based on a

cause of action sounding in negligence if the plaintiff is able to show that "the defendant's

conduct not only was negligent but that the conduct was also outrageous." *Hutchinson*,

870 A.2d at 772.

Accordingly, under Pennsylvania law, a punitive damages claim must be

supported by evidence sufficient to establish that (1) the defendant had a subjective

appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted,

or failed to act, as the case may be, in conscious disregard of that risk. *Id.*  Stated

another way, punitive damages will be imposed where the defendant knew or had reason

to know of facts which create a high degree of risk of physical harm to another, and

deliberately proceeded to act, or failed to act, in conscious disregard of, or indifference

to, that risk. *Id.* at 771 n.7.

Viewing the summary judgment record in the light most favorable to Plaintiff, there

is sufficient evidence to allow a reasonable jury to award punitive damages.  The

Diocesan Defendants and Brother Antonucci knew that Plaintiff was routinely sleeping in

Liberatore's bedroom and that Liberatore had taken Plaintiff on several overnight trips.

The Diocesan Defendants also knew about Liberatore's past involvement with Roe.

Brother Antonucci had been told by Plaintiff that Liberatore had touched him in a sexual

manner.  A reasonable jury could conclude that a minor's sleeping in a priest's bedroom

and a priest's taking a minor alone on overnight trips are facts which create a high degree

of risk of physical harm to the minor.  The failure to end this conduct, with its high degree of risk of physical harm to Plaintiff, could reasonably be viewed by a jury as reckless.  As such, the Court will deny the Diocesan Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages.

**CONCLUSION**

For the above stated reasons, the Court will: (1) grant the Diocesan Defendants' motion for summary judgment as to Count I (18 U.S.C. § 2255) of Plaintiff's Complaint; (2) grant the Diocese, Sacred Heart and Bishop Timlin's motion for summary judgment as to Count III (vicarious liability) of Plaintiff's Complaint; (3) grant Brother Antonucci's motion for summary judgment as to Count IV (aiding and abetting) of Plaintiff's Complaint; (4) grant the Diocese, Sacred Heart and Bishop Timlin's motion for summary judgment as to Count V (negligent hiring, supervision and retention) of Plaintiff's Complaint to the extent that it claims negligent hiring; (5) deny the Diocese, Sacred Heart and Bishop Timlin's motion for summary judgment as to Count V (negligent hiring, supervision and retention) of Plaintiff's Complaint to the extent that it claims negligent supervision and retention; (6) deny Defendants' motion for summary judgment as to Count VI (negligence *per se*) of Plaintiff's Complaint; (7) grant Defendants' motion for summary judgment as to Count VII (intentional infliction of emotional distress) of Plaintiff's Complaint; (8) deny the Diocesan Defendants' motion for summary judgment as to Count VIII (breach of fiduciary duty) of Plaintiff's Complaint; (9) grant Brother Antonucci's motion for summary judgment as to Count VIII (breach of fiduciary duty) of Plaintiff's Complaint; and (10) deny the Diocesan Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages.

An appropriate Order follows.


 March 19, 2007                               /s/ A. Richard Caputo
Date                                          A. Richard Caputo
                                              United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN DOE,

     Plaintiff,

        v.

REV. ALBERT M. LIBERATORE, JR.,
DIOCESE OF SCRANTON, SACRED
HEART OF JESUS CHURCH, BISHOP
JAMES C. TIMLIN, REV. JOSEPH R.
KOPACZ and BROTHER ANTONIO F.
ANTONUCCI,

     Defendants.

CIVIL ACTION NO. 3:04-CV-2427

(JUDGE CAPUTO)

**ORDER**

**NOW**, this   19th   day of March, 2007, **IT IS HEREBY ORDERED** that:

(1)    Defendants Diocese of Scranton, Sacred Heart of Jesus Church, Bishop
James C. Timlin, and Rev. Joseph R. Kopacz's Motion for Summary
Judgment (Doc. 75-1) is:

        (A)    **GRANTED** as to Counts I, III and VII of Plaintiff's Complaint;

        (B)    **GRANTED** as to Count V of Plaintiff's Complaint to the extent
                that Plaintiff claims negligent hiring;

        (C)    **DENIED** as to Count V of Plaintiff's Complaint to the extent
                that Plaintiff claims negligent supervision and retention;

        (D)    **DENIED** as to Counts VI and VIII of Plaintiff's Complaint;

        (E)    **DENIED** as to Plaintiff's claim for punitive damages.

(2)     Defendant Brother Antonio F. Antonucci's Motion for Summary Judgment
         (Doc. 76) is:

         (A)     **GRANTED** as to Counts IV, VII and VIII of Plaintiff's
                 Complaint;

         (B)     **DENIED** as to Count VI of Plaintiff's Complaint.

(3)     This case shall be placed on the **June, 2007** trial list of this Court.


                                         /s/ A. Richard Caputo
                                         A. Richard Caputo
                                         United States District Judge